UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| VALHALLA INVESTMENT | ) | |
|---|---|---|
| PROPERTIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:19-cv-00318 |
| | ) | |
| 502, LLC; WILLIAM E. KANTZ, JR. | ) | |
| and JOHN BRADFORD | ) | |
| SCARBROUGH, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

In Norse mythology, Valhalla is a great hall where slain warriors are received.[1] If the English playwright Edward Bulwer-Lytton was correct in RICHELIEU that "the pen is mightier than the sword,"[2] then Plaintiff – through its verbose and invective-laden filings – has made every effort to meet that metonymic adage, thereby securing its place in a great hall. That great hall, however, would not be the one for warriors slain in battle, or great writers. It would be the extremely crowded hall reserved for former business partners whose relationship has soured, and who have subsequently learned to hate each other.

Now before the Court is Defendants' Motion to Dismiss (Doc. No. 65) on the grounds that the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1562 *et seq*., claim set forth in Count One of the Second Amended Complaint fails to state a claim upon which relief can be granted. This relatively straightforward issue (and the even simpler question of whether a foreign LLC has

---

[1] www.merriam-webster.com/dictionary/Valhalla (all websites last visited on April 21, 2020).

[2] https://en.wikipedia.org/wiki/The_pen_is_mightier_than_the_sword

standing to bring suit on state law claims without a certificate of authority in direct violation of Tenn. Code Ann. § 48-245-601(a)), has led to more than 70 pages of briefing (Doc. Nos. 65, 66, 74, 75 & 78-1). Because this case boils down to a simmering business dispute that is not covered by the FDCPA, the Motion to Dismiss will be granted.

## I. Factual Allegations

The relevant factual allegations from the 160-paragraph, 40-page Second Amended Complaint and its 11 attachments can be summarized for present purposes as follows:

Valhalla is a Delaware limited liability corporation,[3] as is Flex Yield Investments, LLC ("FYI"). FYI's members are Valhalla, William E. Kantz, Jr., and Henry S. Hood. (Doc. No. 63, Amended Complaint ¶¶ 4-6). On March 12, 2009, FYI's three members entered into an operating agreement ("Operating Agreement") under which FYI could perform certain actions, including the sale, acquisition, transfer or encumbrance of real estate; enter into contracts; and issue promissory notes or other debt security. (Id. at ¶¶ 15-16, 18.)

502, LLC is a Tennessee limited liability company that was formed in October 2018 by Kantz and John Bradford Scarborough, both of whom are citizens of Tennessee. The sole and managing member of 502 LLC is Kantz. (Id. at ¶ 8). Scarborough is a lawyer who has represented Kantz in various matters.

Pursuant to its Operating Agreement, FYI purchased two condominiums, consisting of Units 502 and 503, located at 110 31st Avenue in Nashville, Tennessee. Kantz resided in Unit 502, while

---

[3] Although not disclosed anywhere in the Second Amended Complaint, the Business Entity Disclosure filing required by Local Rule 7.01 indicates that the sole and managing member of Valhalla is Scott D. Johannessen (Doc.. No. 6), who is an attorney and represents Valhalla in this action. Johannessen's representation of Valhalla is the subject of a Motion to Disqualify (Doc. No. 54) on the grounds that he will be a necessary witnesses. That Motion will be mooted by the entry of this decision.

Unit 503 was earmarked as a rental unit.

In January 2012, Kantz wanted to sell Unit 503 because he was facing financial difficulties related to an ongoing custody and child support battle he was litigating. He also needed to pay off a personal loan owed to First Bank that was set to mature in August 2012. (Id. at ¶ 20). After some persuasion, FYI's two other members agreed with Kantz to sell Unit 503, provided, however, that all three members "honored the Unanimous Consent Agreement," which required that there be written consent of all FYI members with respect to any condominium-related transaction. (Id. at ¶ 21).

By February 2013, Kantz was still in desperate need of money because of the custody dispute, his need to defend against a lawsuit filed by First Bank, and his obligation to make monthly payments on loans from Bank of America and First Tennessee Bank. (Id. at ¶ 22). Recognizing Kantz's need for capital, Hood and Valhalla agreed to secure a First Bank loan so FYI could borrow money. Kantz could then use the proceeds to pay off some of his debts, and Hood and Valhalla would benefit by obtaining funds for their own personal use. (Id. at ¶ 23).

In accordance with the Unanimous Consent Agreement, FYI authorized debt funding and the recording of a security interest against Unit 502 in exchange for the loan from First Bank. Those funds were to be divided equally among FYI's members. It is unclear from the Second Amended Complaint how much money was borrowed from First Bank, but by mid-May 2013 only about $15,000 was remaining in FYI's bank account, which was the amount held back by First Bank in the case of a default under the loan. (Id.).

Notwithstanding the influx of cash from First Bank, Kantz's financial problems continued. He "repeatedly tried to buy and/or sell Unit 502 and, with respect to Valhalla and Hood, buy and/or

3

sell each of their respective FYI member interests at substantially reduced and below market prices, i.e., 'fire sale' prices.'" (Id. at ¶ 27). Those efforts were rejected by FYI.

At some point after the Unit 502 transaction involving the First Bank loan, Kantz's personal home was foreclosed upon by the holder of the Bank of America debt, and he was sued for collection on his First Tennessee debt. He was also served with a detainer warrant to dispossess him of the house he lost to foreclosure. (Id. at ¶ 28).

Meanwhile, the balance on the First Bank debt purchased by FYI had ballooned from approximately $55,000 to approximately $150,000, during which time Kantz became increasing "short-tempered and incensed with Hood and Valhalla." (Id. at ¶¶ 29-30). In fact, since the Fall of 2017, Kantz refused to allow FYI to rent out Unit 502 to a tenant. This, in turn, led to a negative cash-flow for FYI because monthly rental payments were FYI's only income. It also resulted in approximately $70,000 in lost income, which required Hood and Valhalla to loan certain amounts to FYI in order to make monthly payments toward the First Bank loan, pay property and state taxes, and cover monthly homeowner association dues for Unit 502. Meanwhile, Kantz contributed nothing. (Id. ¶ 31).

The infusions of cash from Hood and Valhalla were not enough to keep FYI afloat and the First Bank loan current. Thus, in the spring of 2018, Hood and Valhalla agreed to have FYI sell or lease Unit 502 through a licensed real estate agent, and those two, along with Kantz, agreed on a $650,000 sales price. (Id. ¶ 32). However, any sale was conditioned on (1) Kantz verifying a trust that he had utilized in the past,[4] and (2) the proceeds being properly accounted for and distributed

---

[4] Valhalla characterizes the trust as a "Phantom Trust," operated by Kantz's sister, whose "origin, pedigree and provenance" has never been established. (Id. ¶ 10).

in accordance with applicable IRS rules and regulations. Kantz refused both conditions, prompting Valhalla to withhold its consent to a sale in accordance with the Unanimous Consent Agreement. (Id. ¶¶ 31-32). As a consequence, Unit 502 did not sell before the First Bank loan went into default and foreclosure proceedings were initiated.

In August 2018, FYI and each of its members received notice that the First Bank loan was in default. They were also informed that a foreclosure sale was scheduled for October 15, 2018. (Id. at ¶ 34-35). In September 2018, all of FYI's members agreed that Unit 502 could be sold to an "existing ready, willing and able buyer," and Kantz prepared a "unanimous consent resolution" which all three FYI members signed. (Id. at ¶¶ 36-37). Nevertheless, Kantz did nothing to sell the unit. Instead, he decided to use Scarborough, his friend and attorney, to help him sell Unit 502 to a surrogate at the foreclosure sale, without Hood's or Valhalla's informed consent. (Id. at ¶ 37). This conflicted FYI's desire to pay off the First Bank loan using the member advances they had previously received. (Id. at ¶ 38).

By the time of the foreclosure sale date, Unit 502 had been vacant for more than a year as a result of "Kantz's "obstinance and obstruction." (Id. at ¶ 39). To stave off the sale, FYI filed for Chapter 11 bankruptcy on October 18, 2018. The bankruptcy case was closed on March 12, 2019 after Kantz and FYI agreed that Valhalla could pursue any claims it had in state or federal court. (Id. at ¶ 56).

While the bankruptcy case was pending, and unbeknownst to Valhalla, Kantz formed 502, LLC, with the help of Scarbrough. (Id. at ¶ 46). During this period, Kantz also raised enough money from third parties to purchase Unit 502 at its fair market value. Thereafter, 502, LLC, purchased the defaulted Tennessee First Bank loan, acquired the deed of trust securing Unit 502,

5

and set out to force a foreclosure sale. The sale took place on April 22, 2019, and Unit 502 was purchased for $530,000.00, which allegedly was $120,000.00 below market value. (Id. at ¶¶ 58-62). This occurred even though before the foreclosure, "FYI had a legitimate offer from a verified third party, with proof of funds, to purchase Unit 502 for $600,000." ((Id. at ¶ 63).

Since the foreclosure, "Defendants have had control over the Unit 502 sale proceeds, but it is anyone's guess what's left." Also open to question is the balance of Kantz's debt to FYI, and the balance of the FYI members accounts." (Id. at ¶ 65). This is because, after 502 LLC was formed, "Kantz, using Scarbrough and 502 LLC as his facilitators, enablers and surrogates, took complete control of FYI's assets (including FYI's bank accounts) and liabilities without Valhalla's consent or its knowledge of 502 LLC's existence." (Id. at ¶ 52). Valhalla has not had access to the proceeds of the sale or any of FYI's records, nor has it received an accounting or been allowed to inspect records, despite repeated requests. (Id. at ¶¶ 65, 157-159).

## II. Standard of Review

The standards governing motions to dismiss are well-known and the subject of countless decisions, making it unnecessary and fruitless in most cases to repeat them. Because, however, Valhalla repeatedly takes Defendants to task for allegedly ignoring those strictures (see e.g., Doc. No.74 at 3-6), the Court summarizes them here to assuage any concerns Valhalla might have about whether the correct standard has been utilized.

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the Court must view the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only "a short and plain statement

6

of the claim," Fed. R. Civ. P. 8(a)(2), a plaintiff must allege sufficient facts to show that the claim is "plausible." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678. Thus, a plaintiff must plead more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." Id. (quoting Twombly, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

### III. Application of Law

Based upon the allegations in the Second Amended Complaint, Valhalla brings a claim under the FDCPA (Count I), and state law claims for breach of contract (Count II), interference with business relations (Count III), misrepresentation and fraudulent concealment (Count IV), and civil conspiracy (Count V). Valhalla also seeks injunctive relief and an accounting under state law (Counts VI & VII). Because Valhalla cannot plausibly state a claim for relief under the FDCPA, the Second Amended Complaint will be dismissed, and the Court will decline to exercise supplemental jurisdiction over the state law claims.

**(A) FDCPA Claim**

"Congress passed the FDCPA to address the widespread and serious national problem of debt collection abuse by unscrupulous debt collectors." Currier v. First Resolution Inv. Corp., 762 F.3d 529, 533 (6th Cir. 2014) (citing S. Rep. No. 95–382, at 2 (1977)). "The Act prohibits a wide array of specific conduct, but it also prohibits, in general terms, any harassing, unfair, or deceptive debt collection practice, which enables 'the courts, where appropriate, to proscribe other improper

7

conduct which is not specifically addressed.'" Id. (citation omitted).

To prevail on a claim under the FDCPA, a plaintiff must show that (1) he or she is a "'consumer' as defined by the FDCPA, (2) the 'debt' arose out of transactions which are 'primarily for personal, family or household purposes[,]' (3) the defendant is a 'debt collector' as defined by the FDCPA, and (4) the defendant violated the prohibitions set forth in § 1692e." Bauman v. Bank of Am., N.A., 808 F.3d 1097, 1100 (6th Cir. 2015) (quoting Wallace v. Washington Mut. Bank, F.A., 683 F.3d 323, 326 (6th Cir.2012)). To establish liability, "a plaintiff does not need to prove knowledge or intent . . . , nor must he show actual damages, which 'places the risk of penalties on the debt collector that engages in activities which are not entirely lawful, rather than exposing consumers to unlawful debt-collector behavior without a possibility for relief.'" Wise v. Zwicker & Assocs., P.C., 780 F.3d 710, 713 (6th Cir. 2015) (quoting Stratton v. Portfolio Recovery Assocs., LLC, 770 F.3d 443, 449 (6th Cir.2014). "In other words, if a debt collector seeks fees to which it is not entitled, it has committed a prima facie violation of the Act[.]" Id.

Recognizing that "[t]he FDCPA is an extraordinarily broad statute," Cagayat v. United Collection Bureau, Inc., 952 F.3d 749, 753 (6th Cir. 2020), the Court studied the Second Amended Complaint looking for any debt that could conceivably be characterized as covered by the FDCPA, but came up empty. In Count I, the Complaint identifies the "debt" as the "Unit 502 Transaction," which is early described (at least in part) as Hood's and Valhalla's agreement in April 2013 for FYI to secure the First Bank loan so as to help out Kantz who was in dire financial straits. In their respective briefs on the Motion to Dismiss, all parties identify the First Bank loan as being the operative debt, and so the Court focuses on that loan as well.

The First Bank loan is not covered by the FDCPA for a least two fundamental reasons. First,

8

the transaction did not involve a "consumer," which is defined by the Act as "any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C.A. § 1692a(3). A corporation or limited liability corporation is, by definition, not a natural person; it is an artificial entity. This is true under the common law, see, Carden v. Arkoma Associates, 494 U.S. 185, 187–88 (1990) ("A corporation is the paradigmatic artificial 'person'"); Tennessee law, where Valhalla is alleged to be a citizen, see, Old Hickory Eng'g & Mach. Co. v. Henry, 937 S.W.2d 782, 785 (Tenn. 1996) (stating that "a corporation is an artificial entity"); and Delaware law, where FYI was formed, see, Transpolymer Indus., Inc. v. Chapel Main Corp., 582 A.2d 936 (Del. 1990) ("A corporation, though a legally recognized entity, is regarded as an artificial or fictional entity, and not a natural person"). As such, FYI is not a consumer as that term is defined in the FDCPA. See Sequel Grp., Inc. v. Wilmington Sav. Fund Soc'y FSB, No. 3:16-CV-2056-N, 2018 WL 2321987, at *5 (N.D. Tex. Mar. 20, 2018) (stating that "a consumer" is "any natural person obligated or allegedly obligated to pay any debt," and that "SGI is a corporation, not a natural person, and [therefore] the Loan does not satisfy the definition of consumer debt under the FDCPA"); Matthews v. HSBC Bank USA, Nat. Ass'n, No. 1:14CV00810 LMB/TRJ, 2014 WL 4270937, at *3 (E.D. Va. Aug. 29, 2014) (The FDCPA defines the term "consumer" as "any natural person obligated or allegedly obligated to pay any debt. This definition clearly excludes all corporations, partnerships, trusts, and other legal entities that are not natural persons.").

To be sure, the term "person" appears elsewhere in the FDCPA, and in those circumstances, it can be interpreted to include artificial entities. See, Anarion Investments LLC v. Carrington Mortg. Servs., LLC, 794 F.3d 568, 570 (6th Cir. 2015) (noting that "when Congress meant to refer only to natural persons [in the FDCPA], it did so expressly," and thus, when the term "person" is

9

used elsewhere in the statute, it "includes both artificial entities and natural persons alike"). Even so, "the definition of debt in § 1692a prevents any person – natural or artificial – from filing a lawsuit over an attempt to collect a debt owed by a business, 15 U.S.C. § 1692a(5), and "[n]ormally, therefore, businesses will not have any basis to bring an FDCPA claim." Id. Here, of course, not only is the "person" that was allegedly aggrieved by violations of the FDCPA an artificial entity (FYI), it is not the one bringing suit. Certainly, in enacting the FDCPA, Congress never envisioned one limited liability company bringing suit over a business debt on behalf of another limited liability corporation.

Even though Defendants' primary argument for dismissal is that Valhalla is not a "natural person," Valhalla does not mention that term in its response brief. That failure continued in its sur-reply,[5] notwithstanding Defendants observation in its reply that "[n]owhere in its 36-page Response does Valhalla argue that either FYI or Valhalla is a natural person and, therefore a consumer under the FDCPA." (Doc. No. 76 at 1). This is likely because the law is clear.

Second, "the FDCPA's definitional section, 15 U.S.C. § 1692a, defines a 'debt' as: 'any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes.'" Obduskey v. McCarthy & Holthus LLP, 139 S. Ct. 1029, 1035 (2019) (quoting 15 U.S.C. § 1692a(5)). Valhalla's own allegations show that the First Bank loan was not a consumer debt.

Nowhere in its filings does Valhalla explain how FYI, the recipient of the First Bank loan,

---

[5] Valhalla has filed a Motion for Leave to File a Sur-Reply (Doc. No. 78), even though such a filing is not contemplated by this Court's Local Rules. Because, however, the Court has considered that filing in formulating this opinion, Valhalla's Motion will be granted.

10

could have the need for personal, family, or household expenses within the meaning of 1692a, probably because it does not. See, Sequel, 2018 WL 2321987, at *5 (noting that a Texas corporation was not an individual that could incur consumer debts for "personal, family, or household needs"); Derrickson v. Am. Nat. Fire Ins. Co., 538 A.2d 1113 (Del. 1988) ("While a corporation may have employees or shareholders as an artificial entity it is not susceptible to a familial relationships"). Instead, Valhalla focuses on its allegations in Second Amended Complaint that

> Kantz used $55,514.93 of his Member Advance to pay off the Defaulted Kantz Debt on [sic] order to settle a lawsuit filed against him personally ("Kantz First Bank Lawsuit") and he used the remaining $20,000.00 to help pay sundry personal expenses, primarily amounts he owed to his personal attorneys relating to the seemingly never-ending Kantz Child Support and Custody Case. Hood used the $80,000.00 he received as a Member Advance for the payment of personal, family and household purposes, including his children's private school education, a vacation, some home repairs, and escalating personal credit card debts. Valhalla used the $75,000.00 it received as a Member Advance for the use of its member for various personal, family and household expenses, including some needed home repairs and time off with his family.

(Doc. No. 63, Second Amended Complaint ¶ 73). Even accepting all of this as true as required by Rule 12(b)(6), this does not plausibly show that the First Bank loan was sought and received "primarily" for "personal, family, or household purposes."

It may well be that FYI's members ultimately used some of the First Bank money for personal matters, but the key focus is on the time of the transaction itself. Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC, 698 F.3d 290, 294 (6th Cir. 2012). This is in keeping with the plain language of the FDCPA, which, as noted, defines "debt" as an "obligation or alleged obligation of a consumer to pay money *arising out of a transaction*." 15 U.S.C. § 1692a(5) (emphasis added).

The Second Amended Complaint specifically alleges that the loan was taken down due to Kantz's "deteriorating personal situations," at a time when (1) neither "Hood nor Valhalla wanted

11

to sell a Condo [because] [t]here was only one left," (2) "a sale would most likely trigger a dissolution event under FYI's Operating Agreement and Delaware law," and (3) "Hood also did not want the income a sale would generate for him personally in 2013." (Id. ¶ 34). Consequently, "Hood and Valhalla agreed to secure a First Bank loan instead so FYI could borrow the money Kantz needed to address some of his problems." (Id.). Thus, as these allegations confirm, the First Loan Bank was taken to help shore up Kantz's finances so that the condominium would not be lost. This is in keeping with FYI's "Company Purpose" of acquiring, maintaining, and improving real property as set forth in the Operating Agreement. (Doc. No. 63-5, Operating Agreement ¶ 2.5).

Let there be no misunderstanding by Valhalla. The Court is not weighing the evidence (there is none yet), or finding one scenario more likely than the other. Rather, this conclusion is based upon the principles that "[f]actual assertions . . . are considered judicial admissions conclusively binding on the party who made them," Kay v. Minacs Grp. (USA), Inc., 580 F. App'x 327, 331 (6th Cir. 2014) (citation omitted), and a "plaintiff can plead [it]self out of court by alleging facts which show that [it] has no claim," Soo Line R.R. Co. v. St. Louis SW Ry. Co., 125 F.3d 481, 483 (7th Cir. 1997). Valhalla's own allegations establish the loan was not for primarily for "personal, family, or household purposes," even ignoring FYI, as an artificial entity, could not have any such expenses or obligations. See, Surber v. McCarthy, Burgess & Wolff, Inc., 634 F. App'x 292, 295–96 (11th Cir. 2015) (noting that, under the "plain language of the FDCPA" and "given the fundamentally commercial nature of this transaction," court could not "look past the transaction that gave rise to [plaintiff's] obligation" in determining whether it was used for "primarily for personal, family, or household purposes"); Slenk v. Transworld Sys., Inc., 236 F.3d 1072, 1075 (9th Cir. 2001) ("[I]t is necessary when classifying a loan to 'examine the transaction as a whole,' paying particular

12

attention to 'the purpose for which the credit was extended in order to determine whether [the] transaction was primarily consumer or commercial in nature.'" ); Downing v. IOU Cent., Inc., No. 1:19-CV-929-MLB-JKL, 2019 WL 3502915, at *8 (N.D. Ga. May 29, 2019) (citation omitted) ("To state a claim that Defendant violated the FDCPA, Plaintiff must allege facts that plausibly suggest that the obligation (or alleged obligation) to pay 'originated from a transaction in which the money or services that were the subject of the transaction were primarily for personal, family, or household purposes.'").

**B. State Law Claims**

With the dismissal of Valhalla's FDCPA claim, the Court will not retain jurisdiction over Valhalla's state law claims against 502, LLC, Kantz, and Scarborough. Under 28 U.S.C. § 1367(c)(3), there is a "strong presumption in favor of declining to exercise jurisdiction over supplemental state-law claims after dismissing federal anchor claims[.]" Martinez v. City of Cleveland, 700 F. App'x 521, 523 (6th Cir. 2017). This presumption is not a strong, however where the case has been pending for a long time, discovery has been completed, the record is voluminous, a court has spent significant time on the litigation, and there are pending motions for summary judgment, Harper v. AutoAlliance Int'l, Inc., 392 F.3d 195, 211 (6th Cir. 2004), none of which applies here. The case is barely a year old, an answer has yet to be filed, and discovery has been stayed pending resolution of the Motion to Dismiss.

## IV. Conclusion

On the basis of the foregoing, Defendants' Motion to Dismiss Second Amended Complaint (Doc. No. 65) will be granted and Valhalla's claim under the FDCPA will be dismissed with prejudice. The Court will decline to exercise jurisdiction over Valhalla's state law claim.

An appropriate Order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE